### PINCH *v.* MORFORD.

BROKERS—EMPLOYMENT—EVIDENCE OF AGENCY.

> In an action to recover a commission for services rendered as
> a middleman in bringing parties together to make an ex-
> change of property, evidence examined, and *held,* to show
> that plaintiff was an active broker, representing the party
> with whom defendant made the exchange, and was not a
> mere middleman, who simply brought the parties together,
> and permitted them to make their own trade, and was con-
> sequently not entitled to recover commissions from defend-
> ant.[1]

Error to Calhoun; Hopkins, J. Submitted October 17,
1905. (Docket No. 68.) Decided November 21, 1905.

Assumpsit in justice's court by Benjamin W. Pinch
against Aylmer D. Morford for commissions on the sale
of certain real estate. Plaintiff recovered judgment, and
defendant appealed to the circuit court. There was judg-
ment for defendant on a verdict directed by the court,
and plaintiff brings error. Affirmed.

*James M. Powers,* for appellant.

*Williams & Beck,* for appellee.

BLAIR, J. This action was commenced in justice's
court to recover a commission of $32, claimed to be due
plaintiff from defendant as the agreed compensation for
his services as middleman in bringing the defendant and
one Conklin together, resulting in an exchange of prop-
erty. Plaintiff recovered judgment in justice's court,
but, on appeal to the circuit court, the court, at the close
of the plaintiff's proofs, directed a verdict for the defend-

[1]As to right of broker to collect commission from both parties to
sale or exchange of property, see note to *Leathers* v. *Canfield*
(Mich.), 45 L. R. A., on page 44.

ant, "on the ground that there was no evidence which tended to show that the plaintiff's employment was that of a middleman, but that his employment was that of an agent or broker for the defendant in the sale of this property." The correctness of this ruling presents the only question for our consideration under the assignments of error.

The only witnesses sworn in the case were the plaintiff and Mr. Conklin, one of the parties to the trade. Plaintiff testified, among other things, as follows:

"On the 13th day of February, 1903, I went over to Olivet. I went in and saw Mr. Morford, and asked him if he wanted to trade his hardware stock, that was owned by Mr. Morford and Mr. Miller, for this Fry forty acres of land, owned by Mr. Conklin, south of there; that Mr. Conklin wanted a hardware stock. Had quite a conversation about it, and he said he didn't think that they wanted to do it. * * * Mr. Morford said to me he wished he could make a trade of this store building, which he individually owned; * * * that he would like to trade this building for that farm. He said, 'Don't you think you could make the trade?' I told him I did not know whether I could or not. He had asked me what Mr. Conklin asked for the farm, and I told him what Mr. Conklin had told me, that he wanted $2,500 for the Fry farm, $2,200 for the Fry farm, and $300 for his equity in the other forty; * * * and he says: 'I will tell you what I will do. I will give $600 in money to boot between this store, which I value at $1,600, and the improved Fry forty.' I told him of course I didn't know whether we would be able to make a trade, but I would lay the matter before them. I went home, and talked with Mr. Conklin concerning the matter, and finally made arrangements whereby Mr. Conklin would go to Olivet and investigate the property. I told him we could not trade for the stock, but could for this property. On the 18th day of February, Mr. Conklin, Mr. Stringham, and myself took the morning train for Olivet. I had some other deals on the string for this Fry forty over there, and I had told Mr. Conklin if he would go, I thought that between the two or three deals I thought we would be able to find one that would be satisfactory to him. He looked at another man's house and lot before he looked at the store, and made up

his mind to go down to the store and look at that property.
He went there, and Mr. Morford wasn't there at that time,
but he came a short time afterwards, and we got together
and talked matters over. He said he didn't want the other
forty, but Mr. Conklin said 'the tail would have to go
with the hide.' He didn't want to let the improved forty
go unless he would let the wild forty go too, which was
incumbered. Finally, he says: 'I will give $800 in cash
between the two, taking the equity in the one and the
other free and clear, and the store property free and clear,
and give $800 in cash.'

"*Mr. Williams:* Who said that?

"*A.* Mr. Morford. Mr. Conklin said he would take a
thousand. Mr. Morford said he wouldn't give it. At
this time, Mr. Morford was in the front of the store, and
Mr. Conklin sat back by the stove, and I talked with one
and then talked with the other. Mr. Morford finally says,
'I will make that $850 in cash, and that is the best I will
do.' I went back again, and talked with Mr. Conklin by
the stove, and I says, 'Conklin, you make the best offer
you will make,' and he said he wouldn't do that. 'You
make the best offer you will make.' He says, 'If he
wants to close that deal up today, I will take $900 in cash,
and I won't take a cent less. You can tell him that, and
if he wants to do business that way, we will do it.' I
went back again, and talked with Mr. Morford. Mr.
Morford says, 'No; I won't give $900.' This was the
time he says 'I will give $850, and I won't give any more.'
Then I went back to Mr. Conklin again, and explained
the matter, and he says, 'No; I will go and see the other
fellow, and I won't take a cent less than $900.' Mr. Mor-
ford had refused to give the $900, and he got up and put
on his coat, and Mr. Stringham put on his coat, and I put
on mine. It was a very cold day, and we started for the
door, and when we got there to the front of the store,
where Mr. Morford was, Mr. Morford—some of them had
made the remark that we would go and see the other
party that was figuring on the deal, and he says, 'Hold
on; I will take up that proposition. I will give you $900.'
He says, 'All right. We will go over to Keyes', over to
the bank, and draw a contract to that effect.' We all
went over there, and Mr. Keyes drew up a contract. I
think there was a forfeiture in there on both sides if one
backed out. They was to have a certain length of time
—perhaps ten days—to get their abstracts around and con-

summate the deal, and they both signed it, and Mr. Keyes and myself signed it as witnesses. * * *

"*Q.* You went down there to sell that property for Mr. Conklin, did you not, or to exchange it?

"*A.* No; I went there on some business of my own.

"*Q.* But you had this property of his for sale or exchange did you not, when you went down there?

"*A.* Nothing more than Mr. Conklin said if I could find anybody down there to buy it, that he wanted to sell or exchange, and wanted me to look around, and see what I could do for him.

"*Q.* He asked you to find a sale or exchange for his property?

"*A.* Yes; he asked me particularly about this stock of goods, and said, 'Go and see if this man, Morford, wants to trade that stock of goods for this farm.' * * *

"*Q.* At any rate you went up there for the purpose, among other things, of seeing whether or not you could make this trade or exchange for Mr. Conklin?

"*A.* I went to Olivet—

"*Q.* You went there for that, among other things?

"*A.* I looked after that, among other things; I was going up there anyway. * * *

"*Q.* (interrupting). Isn't it true that you went in there, and said, 'I have got that Fry farm for sale or exchange?'

"*A.* Oh, no; that is not true.

"*Q.* And that you did not disclose the name of the party that owned the farm, right then and there?

"*A.* No; that is not true either. I told them who owned it. They knew who owned it without my telling them. * * *

"*Q.* Well, while we are on this subject, what were you to get for your services? Was there anything said as to your making Mr. Morford the best deal that you could, or was there anything said of that kind at all?

"*A.* Why, I told him I didn't know whether I could get them to make any deal at all on the real estate.

"*Q.* Did you carry the idea to him that you would do your best you could for him in the matter?

"*A.* No; nothing more than to talk with them, and see whether they wanted to make a trade.

"*Q.* You didn't go and see Mr. Morford, and say to him, 'Mr. Morford, I represent Mr. Conklin in this matter.' You didn't say anything of that kind, did you?

"*A.* Why no; because I didn't represent him any more than he asked me if I wouldn't see if I could get a trade for that stock of goods. * * *

" *Q.* Then you came back down there on the 18th?

"*A.* I did. I went to Olivet on the 18th. I think the letter I received was dated on the 14th of February. I went back up there with Mr. Stringham and Mr. Conklin. * * *

" *Q.* The time you went down there with Mr. Conklin and Mr. Stringham, did you go especially to try to close up some deal for the Fry forty, owned by Mr. Conklin?

"*A.* Yes; that was a special trip to try and get the deal closed up either with Mr. Herricks or Mr. Morford; both of them wanted the forty. * * *

"*Q.* And in what part of the store did this conversation take place?

" *A.* Back by the stove; a good deal of it.

" *Q.* Who was back there by the stove?

" *A.* Mr. Morford, Mr. Conklin, Mr. Stringham, and myself.

" *Q.* Who did Mr. Morford talk with?

" *A.* He talked with Mr. Conklin direct, and talked with Mr. Stringham, and we all talked.

" *Q.* He talked it over with you?

" *A.* Not especially with me.

" *Q.* Who did you talk with?

" *A.* Not especially with any one. I was practically a listener all that time; had got them together, and I let them do their own talking.

" *Q.* You didn't go to Mr. Morford, and tell him what Mr. Conklin was going to do, during that talk?

"*A.* Yes; after Mr. Morford went up to the front of the store. * * *

" *Q.* Who carried the flag of truce back and forth?

" *A.* I guess I did. I talked with Mr. Morford, and then went back and talked with Mr. Conklin.

" *Q.* Did Mr. Morford advise you as to what he would do about the deal?

"*A.* I guess he didn't advise with anybody. * * *

" *Q.* There was considerable negotiating before you closed up that deal altogether on that trip?

"*A.* I think perhaps from the time that Mr. Morford came to the store in the morning to the time that the deal was closed up might have been an hour; might not have been that long. * * *

" *Q.* And did you tell Mr. Morford that you were going to get a commission out of Mr. Conklin?

" *A.* I don't think there was anything said about it. I did get a commission from Mr. Conklin; 2 per cent. on $1,600, amounting to $32. I was paid in cash. * * * He paid me $32, and that was divided with Mr. Stringham.

" *Q.* Where did you make the agreement with Mr. Conklin?

" *A.* Where; about the time the deal took place?

" *Q.* Before you went down to Olivet?

" *A.* Yes; that he should pay me if I made the deal for him.

" *Q.* You would never have taken this thing up with Mr. Morford if you had not expected to get a commission out of Mr. Conklin?

" *A.* I would not. I was to make a deal with no one unless I got my pay for it.

" *Q.* At the time that you went down to Olivet, had you any understanding with him that you were to get a commission on his property?

" *A.* Yes; he wanted to trade for the hardware stock.

" *Q.* You were to get a commission on any trade you might make down there?

" *A.* Certainly. * * * I was asked in relation to receiving a commission from Mr. Conklin in making this deal, and I want to say that I received $32 commission, and I paid one-half of it to Mr. Stringham for helping to make the deal. I divided the commission that I got of Conklin with Mr. Stringham. He was in the real estate business, and went down there to Olivet to help the thing through."

Mr. Conklin testified:

" *Q.* What did you think Mr. Pinch was going to do to earn that money that you expected to have to pay him?

" *A.* He was going to negotiate this deal and work it through for me. I didn't want that farm, and you can't never trade off your own stuff very well to very good advantage. You have got to get some one else to do it, and they won't do it for nothing.

" *Q.* And you expected he would make as good deal as he could?

" *A.* Yes, sir; I expected he would work the deal through in some way or other, and I knew I would look out for myself.

"*Q.* And you expected he would make a good deal for you, as he could under the circumstances?

"*A.* I knew he would make a deal if he could. I did not understand that he would make a deal as good as he could; but he would make a deal, and get commission out of it.

"*Q.* And when you had that understanding with him, you didn't have any talk with him about his also representing Mr. Morford?

"*A.* No, not particularly; but it is rulable to get a commission out of him. I don't know as Mr. Pinch told me that he represented Mr. Morford; I didn't know that he did from anything he ever said. * * *

"*Q.* Now when you had that conversation down there in the store you could not agree with Mr. Morford, and you separated to opposite ends of the store, didn't you?

"*A.* Yes; I think so.

"*Q.* And Mr. Pinch was the man who did the negotiating, was he not?

"*A.* Yes; he acted as a middleman to get us together.

"*Q.* He would talk with you and get your best offer, and go back and forth between you.

"*A.* That is about the size of it.

"*Q.* And you didn't do your negotiating yourself with Mr. Morford, but it was done through Pinch?

"*A.* No; I couldn't do any dickering with him any more than he could with me. Two parties cannot get together very well that way."

We think the circuit judge correctly held that the plaintiff, on the testimony which he produced, was not a middleman, simply bringing the parties together, and permitting them to make their own trade without interference on his part. It is clear that he was an active negotiator, and quite apparent that he was negotiating in the interest of Conklin. He, confessedly, took Mr. Stringham, another real estate dealer, along with himself and Mr. Conklin, "to help the thing through," and he paid him one-half of his commission " for helping to make the deal;" and, according to Mr. Conklin, plaintiff "was going to negotiate this deal and work it through for me. I didn't want that farm, and you can't never trade off your own stuff very well to very good advantage. You

have got to get some one else to do it, and they won't do it for nothing." It is apparent that what Mr. Conklin means, when he speaks of plaintiff as a middleman, is that he was the negotiator through whom the business was transacted.

"*Q.* And you didn't do your negotiating yourself with Mr. Morford, but it was done through Pinch?

"*A.* No; I couldn't do any dickering with him any more than he could with me. Two parties cannot get together very well that way."

Plaintiff did not disclose to defendant that he expected a commission from Conklin, and could only recover upon showing that he occupied a position of middleman, as he claimed. In our opinion, he showed the contrary, as held by the circuit judge, and the judgment is affirmed.

MCALVAY, GRANT, MONTGOMERY, and HOOKER, JJ., concurred.